# Vernon *v.* Vernon, Appellant.

*Divorce—Desertion upon evidence—Charge of court.*

When there is sufficient evidence upon a given point to go to the jury, it is the duty of the judge to submit it calmly and impartially. And if the expression of the opinion on such evidence becomes a matter of duty under the circumstances of the particular case, great care should be exercised that such expression should be given, so as not to mislead, and especially that it should not be one-sided.

*Divorce—Charge of the court—Review of testimony.*

It is reversible error for the court in referring to the testimony in an action for divorce to use language, the effect of which, is to minimize and prejudice the defense. If the testimony is not sufficient, it is the duty of the court to end the trial by peremptory instruction, but the presentation of the case must be made with strict impartiality.

Argued December 10, 1918. Appeal, No. 286, October T., 1918, by respondent, from decree of C. P. No. 3, Philadelphia County, June T., 1916, No. 629, granting divorce

Statement of Facts—Opinion of the Court. [72 Pa. Superior Ct.
in case of Alban J. Vernon v. Hannah M. Vernon. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER. and WILLIAMS, JJ. Reversed.

Libel for divorce. Before FERGUSON, J.

The facts are stated in the opinion of the Superior Court.

*Errors assigned* were various rulings on evidence quoted in the opinion of the Superior Court, and the charge of the court.

*James T. Carey,* and with him *Elgin E. Weest,* for appellant.

*Joseph Singer,* for appellee.

OPINION BY ORLADY, P. J., July 17, 1919 :

The libelant and respondent were married in 1884, and lived together as husband and wife until August, 1913, when the wife removed from their domicile and has continuously lived apart from her husband. The charge in this libel is wilful and malicious desertion without reasonable cause. An issue was framed and on the trial a special question was submitted to the jury, viz: "Did the respondent wilfully and maliciously and without reasonable cause, desert the libelant and absent herself from their habitation on or about August 4, 1913, and persist in such desertion from thence hitherto? If she did desert him without reasonable cause you will answer yes, if she did desert him but had reasonable cause to desert him, you will answer no." The verdict was for the libelant, and the respondent in this appeal urges that the court erred in excluding certain testimony, and in inadequately presenting the defense. The first assignment of error is to the exclusion, under objection, of the question, "Would you have been willing to talk over with your husband the question of living together again if he had not been drunk

when he called to see you?" And further, "Are you willing
to go back and live with him again if he will support you
and ceasing illtreating you?" And again, "Would you
or would you not have been willing, after August 4, 1913,
at any time to go back and live with him, if he made an
offer to you that was in good faith and made it when sober
and offered to stop illtreating you?" The libelant was
prevented from answering these very important ques-
tions, and it is to be reasonably inferred that she would
have answered them in the affirmative, which would nat-
urally have had great weight with the jury in justifying
her living apart from her husband.

It is not possible to reconcile the conduct of the hus-
band toward the wife, as shown by her testimony, which
in considerable measure is assented to by him, with his
marital duties.

A brief excerpt from her testimony illustrates his con-
duct toward her: "Q. Aside from the question of lack of
support, what was your husband's conduct towards you
during that time? A. He cursed me every time he looked
at me. Q. What was your own condition of health, es-
pecially in 1913, just before this alleged desertion? A.
At the time my son was sick I had blood poisoning. I
was in bed seven weeks. The doctor thought I wouldn't
get well. Q. How did your husband treat you at that
time? A. He would come and peep his head in the door
and go out again, and he didn't care whether I had any-
thing to eat or not. Q. You stated that he cursed you
every time he looked at you. Give the court and jury the
language he would use on those occasions. A. It wasn't
very nice. Q. Just tell us. I know it isn't very nice, but
we have to hear those things. A. 'Oh, God damn your
rotten stinking heart to hell,' and called me a bitch and
all those sort of things. Q. Did that conduct continue?
A. Yes. Q. Did it continue after the death of your
daughter or did it stop at that time? A. No, after that
too. Q. What was his attitude at the table with regard
to his meals? A. Cursing what he ate and nothing suited

him.  Q. What kind of curses would he use about the
food?   A. Whatever he would have, it would be, 'God
damn this, and God damn that,' and 'Jesus Christ.'   Q.
You say that after your daughter's death he didn't give
anything toward keeping up the table?   A.  No.   Q.
What happened between you and Mr. Vernon in regard
to his course of conduct?   A. When he got drunk he
would tear the rugs up off the floor and throw his bed out
of the window and curse so terrible that I could hardly
stay in the house.  He came home during my daughter's
sickness and fell drunk at the door and had to be taken
in—at the time she was dying.  Q. It was testified yes-
terday by your husband that he came to see you on two
occasions, in Chester.  Do you remember those visits?  A.
Yes, he was there, but he was drunk both times, and I
was afraid to see him.  Q. He said that he had a conver-
sation with you in Media, at the Court, in which you said
that you would never live with him again.  Did he ever
make any efforts to see you besides these two times?  A.
No, sir.  Q. Has he contributed anything to your support
since that time, excepting under the Court order?  A.
No, sir."

The effect to be given this and the other testimony was
explained by the trial judge as follows : "When you con-
sider the circumstances of people, some men who are per-
fectly honorable and decent and well behaved and good
citizens, sometimes, as a matter of habit and without any
real malice or bad feeling, use strong language and pro-
fane language.  I knew of a distinguished man in Phila-
delphia, who used it constantly, without one thought of
bad feeling.  He used such language when he was in the
presence of his best friends, and when he was full of the
milk of human kindness, but it was a habit.  You know,
with reference to drinking, that some women think a man
is drunk if he has had a drink; some people think a man is
drunk if they can smell liquor on him.  Some men, of
course, are not drunk until they have an awful lot of
liquor in them.  The drunkenness is only a part of it.

The question of cursing comes in. Is Mrs. Vernon the kind of a woman who is going to be rendered unhappy and so unhappy that her life is intolerable and burdensome if she hears some cursing? That is for you.

It is apparent from reading the charge of the learned trial judge that he had clearly defined views as to the merit of the defense, and unmistakably presented them to the jury in such a way as to tend to influence their findings in favor of the libelant. The charge is clearly open to the objection that its tendency was to belittle and prejudice the defense, and that in expression it was not an unprejudiced presentation of the case. If, in the judgment of the trial judge the testimony was not sufficient to sustain a verdict, it was his right and it may have been his duty to have ended the trial by a peremptory instruction. The learned trial judge and every lawyer knows how unfavorable may be the impression made upon jurors who must deliberate and form conclusions within a very few hours, by prominently presenting as the last word to them only one side of a disputed question,—and this too by a judge eminent because of his judicial integrity and ability. Under such circumstances the probability is they will assume there is but one side to the case, and that the one to which the court has called their attention specially and at length.

The well established and frequently expressed rule is clearly stated in Siracusa v. The Miller Construction Co., 43 Pa. Superior Ct. 466, "When there is sufficient evidence upon a given point to go to the jury, it is the duty of the judge to submit it calmly and impartially. And if the expression of an opinion upon such evidence becomes a matter of duty under the circumstances of the particular case, great care should be exercised that such expression should be so given as not to mislead, and especially that it should not be one-sided. The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him; deduction and theories, not warranted by

the evidence, should be studiously avoided; they can hardly fail to mislead the jury and work injustice." While the error is manifest, it was, in our judgment, clearly unintentional. This did not change the effect it was likely to produce on the minds of the average jury.

The first, second, third, sixth and seventh assignments of error are sustained. The judgment is reversed and a venire facias de novo awarded.